**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AUTUMN DRAYTON, as Personal Representative and Successor in Interest of the ESTATE OF NIKO ESTEP, c/o Ali & Lockwood LLP, 501 H Street NE, Suite 200, Washington, D.C. 20002 <br><br> *Plaintiff,* <br><br> v. <br><br> THE DISTRICT OF COLUMBIA, et al., <br><br> *Defendants.* | No. _____ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Autumn Drayton, as personal and legal representative of the deceased minor and District of Columbia resident, Niko Estep, and holding all rights of action accrued to Niko under D.C. Code § 12–101, brings this action against the District of Columbia and four Metropolitan Police Department ("MPD") officers for violations of Niko's rights under the Fourth Amendment to the United States Constitution, and under 42 U.S.C. § 1983, and pendant claims arising under the laws of the District of Columbia.

## INTRODUCTION

1.     On April 22, 2019, MPD Officer Joseph Lopez chased, tackled, horse-collared, forcibly handcuffed, and arrested Niko Estep, a nine-year-old boy who weighed seventy pounds and stood just over four feet tall, while another MPD officer watched and stood by (the "Incident"). More MPD officers then arrived, surrounding Niko while he remained detained in handcuffs for an extended period. No reasonable officer would have viewed Niko as a threat, and the officers had no probable cause to arrest Niko, nor reasonable suspicion to stop or detain him. And the Incident—during which Niko hysterically cried, was so fearful that he wet himself, and sustained

injuries for which he was treated at Children's Hospital—traumatized him so profoundly that he attempted suicide several weeks later.

2.      Before the Incident, Niko was a typical second grader. He loved Spider-Man, climbing trees, video games, playing football and basketball, and spending time with his family. But the 2019 encounter with MPD forever changed him. He became withdrawn, angry, and terrified and distrustful of other authority figures—including his own mother, who at that time was a uniformed law enforcement officer. He stopped wanting to go to school, where his classmates teased him about having cried and urinated on himself during the widely publicized Incident. He was diagnosed with acute post-traumatic stress disorder and major depressive disorder stemming from the Incident. The trauma from the Incident was lasting and altered the trajectory of his life; even years later, his family and friends describe "two" Nikos—the boy he was before the Incident, and the boy he was after the Incident.

3.      In 2023, when he was just fourteen years old, Niko was tragically killed—another victim of gun violence in the District. His mother, legal representative, and survivor, Autumn Drayton, now brings this suit to hold the District and its law enforcement officers accountable for the immense harm they caused her son.

## JURISDICTION & VENUE

4.      Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1343 because this action seeks to remedy violations of the U.S. Constitution under the Fifth Amendment, pursuant to 42 U.S.C. § 1983. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 to hear the remaining claims, which derive from the same events as the constitutional claims.

5.      Venue is proper under 28 U.S.C. §1391(b)(2), as the actions forming the basis of the claim occurred in the District.

6.      Notice was timely provided to the District of Columbia, giving details of the date, time, place, and circumstances of the Incident, as required by D.C. Code § 12-309.

**PARTIES**

7.      Plaintiff is a resident of the District of Columbia and the legal representative and successor of interest to the estate of Niko Estep, holding all rights of action accrued to Niko Estep under D.C. Code § 12–101.

8.      Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C., and operates and governs MPD pursuant to the laws of the District of Columbia.  In this case, the District of Columbia acted through its subdivisions, agents, employees, and servants, including MPD and its officials and agents, who were at all times acting within the scope of their employment.

9.      Officer Joseph Lopez was, at all times relevant to this Complaint, an MPD officer employed by the District of Columbia and acting under color of District Law within the scope of his employment by D.C. MPD. Defendant Lopez is sued in his individual capacity.

10.     Officer Wilfredo Flete-Sosa was, at all times relevant to this Complaint, an MPD officer employed by the District of Columbia and acting under color of District Law within the scope of his employment by D.C. MPD. Defendant Flete-Sosa is sued in his individual capacity.

11.     Officer Marshond Matory was, at all times relevant to this Complaint, an MPD officer employed by the District of Columbia and acting under color of District Law within the scope of his employment by D.C. MPD. Defendant Matory is sued in his individual capacity.

12.     Officer Daniel Styles was, at all times relevant to this Complaint, an MPD officer employed by the District of Columbia and acting under color of District Law within the scope of his employment by D.C. MPD. Defendant Styles is sued in his individual capacity.

13.     Together, Defendants Lopez, Flete-Sosa, Matory, and Styles are referred to as the "Individual Defendants."

## FACTUAL ALLEGATIONS

**The April 22, 2019 Incident & Its Aftermath**

14.     On the evening of April 22, 2019, at approximately 7:00 p.m., Niko Estep—a nine-year-old Black boy who stood just over four feet tall and weighed seventy pounds—was leaning against a parked car in Northwest, D.C., when two MPD officers, Defendants Lopez and Flete-Sosa, approached and told him to get off of the car.

15.     Niko made a disrespectful comment to Defendants Lopez and Flete-Sosa and then ran away. Defendant Lopez chased Niko through the street and around several cars, while Defendant Flete-Sosa stood by. When Defendant Lopez caught Niko, he grabbed the back of Niko's jacket and jerked him backwards, horse-collaring Niko and causing him to fall to the pavement. Defendant Flete-Sosa joined Defendant Lopez in the street. Defendant Lopez held Niko roughly by his arm and dragged him to the sidewalk, while Defendant Flete-Sosa followed closely and repeatedly nudged Niko along with his hand.

16.     Defendant Lopez then pulled Niko's hands behind his back and handcuffed him.

17.     Defendants Lopez and Flete-Sosa were both in full MPD uniforms equipped with an outer ballistic vest, flashlight, ASP, and sidearm. Both men were nearly two feet taller and at least 120 pounds heavier than Niko. At no point did Niko, a small, unarmed second grader, pose, or reasonably appear to pose, any threat to the officers present.

18.     Throughout the time he was being chased, tackled, and handcuffed, Niko was hysterical. Niko was so fearful and distressed by the officers' conduct that he wet himself during the Incident.

4

19.    While Niko was handcuffed, Defendant Lopez was tightly gripping Niko's left arm. Defendant Lopez repeatedly and forcefully pulled Niko upright or closer to him several times.

20.    At one point, the handcuffs slipped off of Niko's small wrists. Defendant Lopez then reapplied the handcuffs tightly while Niko cried out.

21.    During the Incident, a crowd of onlookers gathered and questioned the Individual Defendants about why they were handcuffing a young child.

22.    While Niko was being detained in handcuffs, Defendants Marshond Matory and Daniel Styles arrived on the scene. Defendants Matory and Styles stood between the public bystanders and Defendant Lopez, who was holding Niko in handcuffs, affirmatively acting to keep Niko separated from the crowd and detained by the police. Niko was detained in handcuffs for an extended period of time, with all four Individual Defendants surrounding him.

23.    At no point while Niko was being detained did any of the officers take any steps to investigate any suspected crime. Instead, Defendants Lopez and Flete-Sosa repeatedly demanded that Niko tell them his mother's name. When Niko refused, pleading to be released, they stated that they would not release him or remove the handcuffs until they located his mother.

24.    At one point while Niko was handcuffed and crying, Defendant Lopez mocked him by telling him that he should not be hanging out with older boys if he was going to "cry as soon as you get caught." Defendant Lopez also conveyed to Niko that if he was going to talk a big game, he should "act it."

25.    Despite witnessing Niko's unreasonable seizure and multiple instances of excessive force, at no point during the Incident did Defendants Flete-Sosa, Styles, or Matory attempt to de-escalate the situation, question Officer Lopez's use of force, or attempt to end Niko's detention.

26.    At no point did any of the Individual Defendants make any effort to determine

whether Niko had been injured during the Incident or required medical care.

27.    After Niko's handcuffs were removed, he walked a short distance away from the officers and stood with a group of bystanders. Immediately after the Incident, Niko indicated, while in the presence of the Individual Defendants, that his arm was hurt.

28.    Niko was not charged with any offense and ultimately was released to his mother.

29.    After Niko was released, he was taken to the Children's Hospital at the United Medical Center, where he was treated for contusions on his foot and arm, a knot on his forehead, and several abrasions on his back and around his wrists.

30.    After the Incident, Niko—who had no serious behavioral or diagnosed mental health issues before the April 2019 incident—was diagnosed with acute PTSD and major depressive disorder stemming from the Incident. His behavior and demeanor changed drastically and in lasting ways as a result of the trauma he suffered during the Incident.

31.    The April 2019 incident was so traumatic that it led Niko to attempt suicide in July 2019, resulting in a visit to the emergency room and admission to an in-patient psychiatric ward.

32.    The physicians and mental health professionals who treated Niko after his suicide attempt noted that Niko became severely depressed as a result of the Incident, would often refuse to leave the house, experienced severe disruption to his sleep and poor appetite, lost interest in the activities he previously enjoyed, became prone to extended crying spells, experienced frequent stress-induced headaches and body aches, and suffered from a debilitating fear that police would come to his home and take him away or harm him or his family members. These treating physicians noted that Niko had never experienced suicidal ideations before the Incident, but began to consider suicide within approximately one week of the Incident.

33.    Niko's performance in school also suffered after the Incident. Niko was reluctant

to go back to his school, where other students teased him about the Incident and the fact that he had cried and urinated on himself while being chased and detained by police. He transferred schools at least four times between fifth and ninth grade.

34.    Niko also became terrified of police and developed trust issues concerning adults more generally. Niko's mother worked as a uniformed law enforcement officer. Niko developed debilitating fear and anxiety when he saw her in uniform.

35.    Niko never fully recovered from the trauma of the Incident. He continued to suffer its psychological and behavioral effects even years later, and this trauma set him down a troubled path. For example, when Niko experienced a mental health crisis in 2022 and his family called emergency services, Niko became acutely distressed and ran away when police arrived.

36.    In 2023, when he was just fourteen years old, Niko was tragically killed in a shooting—another victim of gun violence in the District.

**The District's (i) Widespread Policy & Custom of Detaining and Handcuffing Children, and (ii) Failure to Adequately Train or Supervise its Officers Concerning How to Appropriately Interact with Children.**

37.    Immediately following the April 22, 2019 incident, a member of the D.C. Council wrote a letter to then-MPD Chief Newsham and the Deputy Mayor for Public Safety and Justice stating: "I find it difficult to express in a letter how disturbed I feel—how difficult it is to capture my visceral reaction to a small, young, African American boy screaming as he struggles against handcuffs in the middle of a street with other children and adults watching and recording." He also lamented that Niko's arrest was one of several detentions of children by MPD in recent weeks, and noted that MPD's widespread conduct was "systemically unacceptable." Mayor Muriel Bowser agreed in public statements that the Incident warranted a review of District-wide policy and practice concerning MPD's treatment and handling of youth, particularly children aged twelve and under. Then-Attorney General Karl Racine called the video of the Incident "obviously

7

concerning."

38.      At and around the time of the Incident, the District and D.C. MPD officers maintained a widespread custom and policy of routinely stopping, searching, detaining, and handcuffing youth, including frequently handcuffing children aged twelve or younger. MPD's misconduct involving Niko in April 2019 was one of a string of similar incidents in and around the same time period.

39.      For example, in late December 2018, seven MPD officers frisked and detained three Black boys between the ages of nine to twelve in the Capitol Hill neighborhood for approximately one hour. This incident received significant media attention and MPD came under heavy public criticism for the way its officers conducted the investigation. As one community member who witnessed the events described: ". . . it was really hard to see. They were so little, and their bodies are just so small, and their pockets are being dug into. Their little legs are being touched. . . I felt scared and sad also for them." The First District Commander agreed after an internal review that officers could have approached the situation differently, and less aggressively.

40.      But the District did nothing to try to ensure that incidents like this wouldn't be repeated. Just a few months later, for example, in February 2019, a group of MPD officers detained approximately 15-20 Black children outside of the Petworth Metro station for almost an hour. At least two children were handcuffed during the incident.

41.      The following month (March 2019)—just a few weeks before the Incident involving Niko—MPD officers handcuffed and detained a ten-year old Black boy in Northeast D.C. and put him in the back of a squad car. After reviewing surveillance video footage, then-Attorney General Karl Racine described the child as "completely innocent." Racine nevertheless issued a press release stating that MPD officers "acted in accordance with MPD policies and

procedures" when they handcuffed this child, underscoring that the District maintained a custom and practice of handcuffing children at the time of the Incident.

42.     Upon information and belief, the above incidents make up a fraction of the actual number of incidents of misconduct by MPD toward kids in the District before, at the time of, and after the Incident.

43.     Indeed, in March 2016, the D.C. Council passed the Neighborhood Engagement Achieves Results (NEAR) Act, a statute requiring MPD to keep extensive records on every stop its officers complete. For over three years, MPD refused to implement the statute. After a lawsuit that ended with the court ordering MPD to comply with the statute, the District finally began collecting NEAR Act data on July 22, 2019. The first data collection, which covered the period immediately after the Incident (July 22, 2019 through December 31, 2019), revealed that Black youth like Niko faced a vastly greater risk of being stopped by MPD than white youth. In 2019, nearly 89%—seven out of every eight—of minors stopped by MPD were Black. Black youth were stopped at approximately ten times the rate of their white peers, based on their respective percentages in the D.C. population. The numbers are especially startling for Black boys, like Niko, who were stopped in 2019 at *12.5 times* the rate of white boys. Black youth were also searched at astronomically higher rates than white youth; in the first period for which data were made available (2019), *736* Black children were searched, as compared to just *four* white children during the same period. As the Washington Post Editorial Board put it in an April 2019 opinion piece reacting to Niko's arrest: "If the 9-year-old leaning against the car had been white, would police have even thought to shoo him away? If the incident had occurred in a cul-de-sac in Ward 3 instead of a Columbia Heights intersection, would it have been handled differently? And would a white kid mouthing off be seen through the same lens as a black child talking back?"

44.     The incidents described above, including the Defendants' use of handcuffs on and force against Niko, were part of a routine pattern, custom, and practice by the District and its officers. This pattern, custom and practice was a moving force behind the Defendants' treatment of Niko during the Incident.

45.     Likewise, the District's failure to adequately train and supervise its officers about their interactions with District youth in the months leading up to the Incident—even in the face of high-profile incidents that led to public outcry and significant media attention—was a moving force behind what happened to Niko on April 22, 2019.

46.     It is well known that police stops can be traumatic experiences with long-lasting social and psychological consequences, particularly for children. The use of handcuffs on children is also commonly known to be extremely traumatizing, is routinely condemned as barbaric, and is either a forbidden or strongly curtailed practice in many jurisdictions within the United States. In the words of the Washington Post Editorial Board:

> The incident [involving Niko], and one involving a 10-year-old less than a month before, has prompted D.C. Attorney General Karl A. Racine, with agreement from police and the mayor, to launch a review of police procedures regarding minors that will include an examination of best practices from other departments. That's all fine and good, but officials surely don't need a study to recognize and acknowledge the damage that has been done. Among those hurt are the police themselves, whose hard jobs are made easier when they operate with the trust and respect of the community.

47.     In January 2020, in response to public outcry about MPD's treatment of kids in the District—and particularly Black youth—then-MPD Chief Newsham issued new guidance concerning the arrest of minors. That new policy stated: "Members shall NOT handcuff juveniles under the age of twelve (12) unless they present a danger to themselves or others. When an officer has deemed it necessary to arrest a juvenile aged twelve (12) and under, he or she must, prior to making the arrest, contact the watch commander of the Youth and Family Services Division at

(202) 437-8062 or (202) 576-6768 and be guided by their decision." Metropolitan Police Academy Policy § 6.2.2. In addition, the revised policy states that officers "shall consider the severity of the offense" when "determining whether to handcuff juveniles aged 13 through 17."

48.     Chief Newsham described in public statements that two major catalysts for the policy change were the fact that (i) "[j]uveniles don't have the same brain development as adults, and they need to be treated differently particularly when they're getting into interactions with police," and (ii) interactions between youth and police can "chip[] away at the trust we're trying to build with the community."

49.     For Niko, these policy changes came too late; the damage was already done.

50.     Moreover, the January 2020 policy change unfortunately has not prevented MPD officers from continuing to gratuitously detain and handcuff young children, and particularly young Black boys. This includes an incident as recently as in June 2024 involving the handcuffing of a disabled eight-year-old Black boy in Northeast D.C.

## CLAIMS FOR RELIEF

### Count I: Unreasonable Seizure in Violation of the U.S. Constitution, Fourth Amendment, 42 U.S.C. § 1983
### (The Individual Defendants)

51.     Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

52.     The Individual Defendants, acting under color of law, deprived Niko of his right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

53.     Defendant Lopez unlawfully detained Niko, a nine-year-old minor at the time, without reasonable suspicion to stop him, nor a warrant or probable cause to arrest him, when he forced Niko to the ground, placed Niko in handcuffs, and prevented Niko from leaving the scene for an extended period of time.

54.    Defendant Flete-Sosa was present for the entirety of Niko's detainment and participated directly in the unreasonable seizure. Defendant Flete-Sosa was present during the chase, tackling, and handcuffing. He interrogated Niko for his mother's name after Defendant Lopez placed the child in handcuffs. He stood guard while Niko was detained and acted as a barrier between other innocent bystanders and Niko. At no point did Defendant Flete-Sosa act to challenge, question, or stop the unlawful arrest.

55.    Defendants Matory and Styles arrived while Niko was being placed in handcuffs or shortly thereafter. They participated directly in the unreasonable seizure by acting to prolong Niko's detainment while he was in handcuffs. Defendants Matory and Styles stood guard and acted as a barrier between other innocent bystanders and Niko. At no point did they act to challenge, question, or stop the unlawful arrest.

56.    At no point did Defendants have probable cause to arrest Niko or place him in handcuffs. At no point was Niko engaged in behavior that would lead a reasonable officer to suspect him of committing a crime. Niko, a small, unarmed, nine-year old child, did not reasonably pose any threat to uniformed law enforcement officers equipped with weapons and body armor.

57.    In addition to lacking probable cause or reasonable suspicion to detain Niko in the first place, Defendants did not limit Niko's detainment to the scope or duration reasonably necessary to confirm or dispel any supposed suspicion. At no point during Niko's detainment did any of the Individual Defendants make any attempt to investigate any suspected crime, nor did Defendants ever tell Niko or otherwise suggest that he was suspected of any crime. Instead, Defendants repeatedly stated that Niko was being detained and handcuffed until they could speak with his mother.

58.    At no point was there evidence or an assertion by the Individual Defendants that

12

Niko was detained or handcuffed because he represented a safety threat to himself or others. To the contrary, Defendant Lopez's mocking comments indicate that Niko was arrested and handcuffed as a display of dominance and discipline by the police officers, and in retaliation for Officer Lopez having felt disrespected by Niko.

59.    The totality of the circumstances shows that Defendant Lopez's arrest and handcuffing of Niko were unreasonable.

60.    The Individual Defendants are jointly and severally liable for the violation of Niko's Fourth Amendment right to be protected from unreasonable seizure. In the alternative, Defendants Flete-Sosa, Matory, and Styles are liable as bystanders to Defendant Lopez's violation of Niko's Fourth Amendment rights, having knowledge of the unreasonable seizure, reasonable opportunity to prevent the violation, and making no effort to do so.

61.    The Individual Defendants' unreasonable seizure of Niko was a substantial factor in causing Niko's harm. Defendants acted with reckless or callous indifference to the federally protected rights accruing to Plaintiff. As a direct and proximate result of Individual Defendants' unlawful conduct, Niko incurred medical expenses and suffered severe injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive damages.

**Count II: Excessive Force in Violation of the U.S. Constitution, Fourth Amendment, 42 U.S.C. § 1983
(The Individual Defendants)**

62.    Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

63.    The Individual Defendants, acting under color of law, deprived Niko Estep of his right to be free from excessive force under the Fourth Amendment to the United States

Constitution.

64.    The Individual Defendants' violation of Niko's Fourth Amendment right to be free from unreasonable seizure permits an additional, de facto finding of excessive force.

65.    Defendant Lopez maliciously and intentionally employed excessive force and violence when he arrested Niko, a nine-year-old child, by grabbing the back of his jacket, horse-collaring him, forcefully pulling him to the ground, pulling him up again by the arm, and applying handcuffs. Defendant Lopez handcuffed Niko tightly, injuring his wrists. Defendant Lopez held and repeatedly dragged Niko upright while Niko was handcuffed, injuring Niko's arm. Niko also suffered contusions on his foot and arm, a knot on his forehead, and several abrasions on his back due to Defendant Lopez's excessive use of force. Also as a result of the Incident, Niko suffered severe psychological trauma, culminating in long-term diagnoses of acute PTSD and depression, and a suicide attempt followed by in-patient hospitalization. Even after he was discharged from in-patient care, his treating physicians cautioned that he was a high suicide risk as a result of the trauma from the Incident.

66.    Defendant Flete-Sosa was present during and participated directly in each instance of excessive force. Defendant Flete-Sosa supported Defendant Lopez by acting as his supporting officer during the chase, forceful horse-collaring, and handcuffing. He interrogated Niko for his mother's name after Defendant Lopez placed the child in handcuffs, stood guard while Niko was detained, and acted as a barrier between other innocent bystanders and Niko. At no point did Defendant Flete-Sosa act to challenge, question, or stop Defendant Lopez's actions.

67.    Defendants Matory and Styles arrived while Niko was being placed in handcuffs, or shortly thereafter.  They participated directly in the use of excessive force by acting to prolong Niko's detainment in handcuffs. Defendants Matory and Styles stood guard and acted as a barrier

between other innocent bystanders and Niko. At no point did they act to challenge, question, or stop the use of handcuffs.

68.    At no point was there evidence or an assertion that Niko was handcuffed because he represented a safety threat to himself or others. To the contrary, Defendant Lopez's mocking comments indicate that Niko was arrested and handcuffed as a display of dominance and discipline by the police officers, and in retaliation for Officer Lopez having felt disrespected by Niko.

69.    The Individual Defendants' use of force was unreasonable and excessive under the totality of circumstances.

70.    The Individual Defendants are jointly and severally liable for the violation of his Fourth Amendment right to be protected from excessive force. In the alternative, Defendants Flete-Sosa, Matory, and Styles are jointly and severally liable as bystanders to Defendant Lopez's violation of Niko's Fourth Amendment rights, having knowledge of the excessive use of force, reasonable opportunity to prevent the violation, and making no effort to do so.

71.    The Individual Defendants' use of excessive force was a substantial factor in causing Niko's harm. Defendants acted with reckless or callous indifference to the federally protected rights accruing to Plaintiff. As a direct and proximate result of Individual Defendants' unlawful conduct, Niko incurred medical expenses and suffered injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive damages.

### Count III: *Monell* Claim for Unreasonable Seizure and Excessive Force Violations of the U.S. Constitution, Fourth Amendment, 42 U.S.C. § 1983 (Defendant District of Columbia)

72.    Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

73.     At the time of the Incident, MPD had a widespread practice, custom, and policy of routinely handcuffing, detaining, and arresting young children, and particularly young Black boys in the District. This practice, custom, and policy was a moving force behind and proximately caused the violation of Niko Estep's Fourth Amendment rights on April 22, 2019.

74.     MPD's failure to adequately train its officers about how to appropriately interact with District youth, despite its knowledge that the detainment and handcuffing of children was routinely occurring, was likely to occur again, and was likely a violation of those children's constitutional rights, was a moving force behind and proximately caused the violation of Niko's Fourth Amendment rights.

75.     MPD's failure to adequately supervise its officers about their interactions with District youth, despite its knowledge that the detainment and handcuffing of children was routinely occurring, was likely to occur again, and was likely a violation of those children's constitutional rights, was a moving force behind and proximately caused the violation of Niko's Fourth Amendment rights.

76.     For the aforementioned reasons, the District's persistent practices, customs, and policies, and its failures to adequately train and supervise its law enforcement personnel, amounted to deliberate indifference towards these constitutional violations and the likelihood of further constitutional injury, which was a moving force behind and proximately caused the violation of Niko's Fourth Amendment rights.

77.     The District's 2020 policy amendments, and comments by then-MPD Chief Newsham, Mayor Bowser, and then-Attorney General Racine surrounding those policy changes, show that Defendants knew or should have known that their conduct caused immense harm, both to the youths directly affected by the District's conduct and to entire communities within the

District, and that such policy changes were possible before the violation of Niko's Fourth Amendment rights.

78.     As a direct and proximate result of Defendant District of Columbia's unlawful conduct, Niko suffered injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive damages.

**Count IV: Common Law False Arrest**
**(All Defendants)**

79.     Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

80.     As described in Count I and throughout this Complaint, Defendants Lopez, Flete-Sosa, Matory, and Styles intentionally violated Niko Estep's personal interest in freedom of restraint of movement and did restrain him against his will.

81.     As described in Count I and throughout this Complaint, Defendants Lopez, Flete-Sosa, Matory, and Styles acted to restrain Niko without reasonable suspicion or probable cause that any criminal offense had been, was being, or would be committed. All Individual Defendants are jointly and severally liable for the common law tort of false arrest, having actively participated in the contact with Niko.  In the alternative, Defendants Flete-Sosa, Matory, and Styles are liable as bystanders to Defendant Lopez's common law tort of false arrest, having knowledge of the violation, reasonable opportunity to prevent it, and making no effort to do so.

82.     Defendants acted with reckless or callous indifference to Niko's rights. As a direct and proximate result of the Individual Defendants' unlawful conduct, Niko suffered injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive

17

damages.

83.     Defendant District of Columbia is vicariously liable for the common law tort of false arrest carried out by its employees, the Individual Defendants, acting in their public or employee capacity as law enforcement officers.

### Claim V: Common Law Battery
### (All Defendants)

84.     Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

85.     As described in Count II and throughout this Complaint, Defendant Lopez placed Niko Estep in apprehension of commission of battery upon him, and then did inflict injuries upon him by grabbing the back of his shirt, horse-collaring him, jerking him backwards to the ground, pulling him back up again by the arm, handcuffing him tightly at the wrists, and continuing to hold, pull, and drag him up by the arm while he was detained. Defendant Lopez intended to cause Niko to suffer that contact, and apprehension of that contact was imminent.

86.     As described in Count II and throughout this Complaint, Defendants Flete-Sosa, Matory, and Sosa were participants and actively supported the battery upon Niko.

87.     All Individual Defendants are jointly and severally liable for the common law tort of battery, having actively participated in the contact with Niko. In the alternative, Defendants Flete-Sosa, Matory, and Styles are liable for Defendant Lopez's common law tort of battery because they had a special relationship with Niko and failed to honor their duty to protect him while that relationship was in place. Niko was subjected to the battery while he was in police custody and reliant on police protection. In the alternative, Defendants Flete-Sosa, Matory, and Styles are liable as bystanders to Defendant Lopez's common law tort of battery, having knowledge of the battery, reasonable opportunity to prevent it, and making no effort to do so.

88.     Defendants acted with reckless or callous indifference to Niko's rights. As a direct and proximate result of Defendants' unlawful conduct, Niko suffered injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive damages.

89.     Defendant District of Columbia is vicariously liable for the common law tort of battery carried out by its employees, Individual Defendants, acting in their public or employee capacity as law enforcement officers.

### Count IV: Intentional Infliction of Emotional Distress
### (Defendant Lopez and the District of Columbia)

90.     Plaintiff incorporates all preceding paragraphs of this Complaint into this cause of action as if fully set forth herein.

91.     Defendant Lopez's conduct, detailed more fully above, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.

92.     Defendant Lopez's conduct was intentional insofar as he intended to cause Niko emotional distress. His conduct was reckless because he was aware of and consciously disregarded the near certainty that it would—and did—cause Niko emotional distress. Defendant Lopez acted intentionally and recklessly when he chased Niko through traffic; continued to pursue him as he cried, urinated on himself out of fear, and called out for his mother; detained him and placed him in handcuffs for an extended period of time; yelled at and demanded information of him while detained; and mocked him for his distress.

93.     As a direct and proximate result of Defendant Lopez's unlawful conduct, Niko suffered injuries and other damages and losses as described herein—including deprivation of his liberty, fear, anxiety, humiliation and offense, and emotional distress—entitling Plaintiff to compensatory and punitive damages.

94.    Defendant District of Columbia is vicariously liable for the acts of its employee, Defendant Lopez, who was acting in his public or employee capacity as a law enforcement officer.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants and:

95.    Declare Defendants' conduct to be unlawful;

96.    Award Plaintiff compensatory and punitive damages in an amount to be determined at trial;

97.    Determine that Defendants shall bear the costs of this proceeding, including reasonable attorneys' fees, including any applicable prejudgment interest, and litigation costs reasonably incurred in this action; and

98.    Grant Plaintiff any other relief that this Court deems just, proper, and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.


Dated: October 23, 2024

*/s/ Kathryn Ali*
Kathryn Ali (D.C. Bar No. 994633)
Elizabeth Lockwood (D.C. Bar No. 1029746)
Meghan Palmer (D.C. Bar No. 1736144)
ALI & LOCKWOOD LLP
501 H Street NE, Suite 200
Washington, D.C. 20002
(202) 651-2475
katie.ali@alilockwood.com
liz.lockwood@alilockwood.com
meghan.palmer@alilockwood.com

*Counsel for Plaintiff*